OPINION OF THE COURT
Emily Jane Goodman, J.
*690 This petition by the Jewish Association for Services for the Aged. (JASA), one of the few community guardians serving the elderly in New York City, presents a critical issue concerning care for the elderly. JASA was appointed conservator of the property of Maria Cedeno in April of 1991. At that time, Ms. Cedeno resided in the community. In 1993 she was hospitalized at St. Luke’s Roosevelt and, when she was medically ready for discharge, the hospital apparently determined that she could not return to the community because of her mental and physical disabilities. JASA’s role in this determination, if any, is not clear from the record before the court.
Ms. Cedeno was then permanently placed at the Jewish Home and Hospital, a long-term nursing home facility in the Bronx. JASA, as a community guardian program authorized to act only under section 473-d of the Social Services Law, is required to relinquish its duties as conservator / committee / guardian if a person for whom the community guardian program is appointed enters a residential facility on a long-term basis. Accordingly JASA now moves for an order judicially settling its account as conservator.
What happens to Ms. Cedeno if and when JASA is discharged as her conservator? Article 81 of the Mental Hygiene Law, of course, authorizes this court to appoint a successor guardian. However, this court is not aware of any funding available for persons to serve as guardian for indigent persons such as Ms. Cedeno nor of a public guardian or any other person or entity who will serve as a guardian for an indigent person residing in a nursing home.
According to JASA’s counsel, the routine procedure in cases such as this is for the court to relieve the community guardian and appoint a guardian ad litem for the limited purpose of verifying that the conservatee/incapacitated person is receiving Medicaid and other available benefits. However, a guardian ad litem will not visit Ms. Cedeno on a regular basis at the nursing home or have any ongoing responsibility to check on her care.
Thus it appears that if this court grants JASA’s motion to be relieved, Ms. Cedeno effectively will be dumped in a nursing home with no one to look out for her. The court declines to do this without assurance of a guardian to watch over her. This does not reflect any reservations or negative impressions of the nursing home or JASA. Riather, it is in recognition of the special care needs of the indigent elderly, especially in this era of heartless budget cuts. Nursing homes do not have the staff *691 to ensure that residents are receiving, for example, the foods that they prefer, fresh air, reading materials and the innumerable other components of a meaningful life.
According to the New York Times there are 12,000 trained and State-licensed volunteers nationwide serving as long-term care ombudsmen under a State-run program funded by the Federal Government and administered by the Federal Administration on Aging. The total Federal, State and local contribution to the program was about $40 million last year nationwide. A study last year by the Institute of Medicine, a branch of the National Academy of Sciences, found that the ombudsmen had played an important role in reducing chemical dependence, decreasing the use of physical restraints and generally improving the lives of the Nation’s 1.5 million nursing home residents. However, the Administration on Aging reports that more than 218,000 complaints were made by nursing home residents and their families to ombudsmen programs in 1995. That was twice the figure for 1987. In New York City, there are just 80 volunteers in the ombudsmen program and 174 nursing homes and 52 small bed-and-care centers. The social service professionals on the City’s ombudsmen’s staff, two full time and one part time, are responsible for investigating complaints received from sites not covered by volunteers. The program is run from the offices of the New York Foundation for Senior Citizens. The program is understaffed and underfunded at the time that need for it is increasing dramatically. (New York Times, Oct. 24, 1996, at C4.)
While the need for care for physically frail older people in nursing homes increases, City cutbacks in home nursing services, attendant services and other Medicaid-funded programs are forcing more and more people from the community into institutions. For example, this court recently presided over a Mental Hygiene Law article 81 proceeding in which an elderly woman who was temporarily hospitalized wished to return to her home after completion of her medical treatment. The hospital petitioned for appointment of a guardian. Upon examination of the woman and the testimony of health care professionals at a hearing in court, the court determined that a guardian was needed. The court also found that she could return home provided that 24-hour home care was available. A court-appointed pro bono attorney and court-appointed pro bono special guardian worked with various agencies to obtain Medicaid coverage for full-time home care. The provider agency would not provide any coverage unless there was a community *692 guardian to serve as a backup. However, as the woman was in a nursing home, albeit awaiting to return to her home in the community, the community guardian programs such as New York Foundation for Senior Citizens, Self-Help and JASA are not permitted by their contracts to serve as guardian. Court personnel searched unsuccessfully for six months for a pro bono attorney or other qualified individual who would agree to serve as a guardian in the community for the woman. In the meantime, the woman’s health deteriorated and the medical providers were unanimous in their view that she was no longer physically able to return home. After further investigation, the court was able to find a practicing attorney who agreed to serve as a pro bono guardian for the woman provided that she remained in the nursing home. This is just one of many cases this court has dealt with in the last several years where the absence of a public guardian or organization to provide guardians for incapacitated persons living in institutions has seriously harmed an elderly person.
The legislative findings and purpose of article 81 of the Mental Hygiene Law state that "[t]he legislature hereby finds that the needs of persons with incapacities are as diverse and complex as they are unique to the individual” and ”[t]he legislature declares that it is the purpose of this act to promote the public welfare by establishing a guardianship system which is appropriate to satisfy either personal or property management needs of an incapacitated person in a manner tailored to the individual needs of that person”. (Mental Hygiene Law § 81.01.) The court cannot fathom how this mission is served by the current funding scheme under which JASA and other community guardians must terminate their services to physically frail older people who are placed in nursing homes. Therefore, the court declines to sign the proposed order permitting JASA to settle its conservator’s account and hereby appoints JASA as guardian for Maria Cedeno until a substitute guardian is located and appointed. JASA is hereby ordered to submit to the court within 30 days an evaluation of Ms. Cede-no’s needs, based on recent visits by JASA to Ms. Cedeno and an up-to-date review of her medical and other records. The court will then work with JASA to locate an appropriate guardian.